CHARLESTON.

ROBINSON *v.* JAMES *et al.*

Submitted September 6, 1886.—Decided November 25, 1886.

A plaintiff in a chancery cause as sole heir of A. claims of the defendant, the grantee of B., a lot under a written agreement between B. and C. entered into at the same time, that C. conveyed the lot to B.—HELD :

I. WITNESS—LOST PAPERS.

> After the death of the parties to this agreement the plaintiff is incompetent as a witness to prove, that said agreement has been lost, and that, when it was entered into, B. read it to C. in the presence of the plaintiff, and he thus obtained a knowledge of its contents, and that by it B. agreed to convey the lot to A. (p. 233.)

II. WITNESS.

> He is also incompetent under these circumstances to testify that B. frequently admitted to him, that he, B., held this lot in trust for A. (p. 233.)

Statement of the case by GREEN, JUDGE :

This was a chancery suit brought by James H. Robinson in the Circuit Court of Ohio county on May 15, 1882, against Annie M. James and J. S. James, her husband, and George Robinson, receiver. The bill was filed at June rules, 1882. It sets out, that the plaintiff is the father and sole heir of James A. Robinson, who died intestate on the 2d day of December, 1879, without having been married ;—that the plaintiff's father, William Robinson, died intestate on the 27th day of September, 1852, leaving no widow but five children living, one daughter, Sarah Ann Cline, who is now a widow, and four sons, John, George, William Tate and the plaintiff, James H. Robinson ;—that George Robinson, one of the de-

fendants, is now under an order of the Circuit Court of Ohio county in a case (not named) the special receiver of the rents of two houses, one of them being the house claimed by the plaintiff in this bill;—that all of the children of William Robinson, deceased, are now dead except Sarah Ann Cline and the plaintiff;—that William Robinson in his lifetime owned sundry houses and vacant lots in Wheeling worth about $25,000.00;—that on July 1, 1849, he agreed in writing to transfer all of said real estate, and he owned no personal estate of any amount, to his son, William Tate Robinson;—that in the same writing he further agreed to erect three brick buildings, adjoining each other on three lots named in the agreement being part of the land, which was to be transferred to his son, William Tate Robinson, and for which by this agreement he was to make to said son an absolute deed, but with the express understanding set out in said agreement, that as soon as these houses were built, William Tate Robinson was to convey one of them with the lot, on which it was built, to his sister and another of them with lot, on which it was built, to his nephew, James A. Robinson, son of the plaintiff and grandson of William Robinson;—that the lot, which, it was agreed, should be conveyed to the plaintiff's son, was that, on which now stands the house numbered 1031 on the west side of 'Chapline street; that the lot, which, it was agreed, should be conveyed to the daughter of William Robinson, was that, on which now stands the house on Chapline street numbered 1029;—that in accordance with this written agreement William Robinson at once executed a deed to his son conveying all of his real estate particularly described in the deed, which was duly recorded on the 29th day of July, 1851, and a certified copy of it filed with the bill.

This deed is dated July 1, 1849, and on its face purports to be made for $15,000.00 as follows:   $1,000.00 in cash, the receipt of which is acknowledged,—$1,000.00 to be paid on September 1, 1849,—$1,000.00 on October 1, 1849,—$2,000.00 on November 1, 1849,—$5,000.00 on January 1, 1850, and $5,000.00 on January 1, 1851.   For the two last payments, the deed recites, two negotiable notes were given by William Tate Robinson to William Robinson payable at the

29

Merchants' and Mechanics' Bank. It was stipulated in this deed, that the grantee agreed to let George Robinson remain in quiet possession of the lot and house, in which he then resided, until the 1st day of April, 1860, which was more than ten years. It was a deed of general warranty; and this was all, that appeared on its face.

The bill further alleges, that said William Robinson in further execution of said written agreement did build the said three brick houses, finishing them in March, 1852;—that said agreement was dated the — day of ——, 1849, and was executed in the store of the plaintiff, James H. Robinson, and was in his possession but has since been lost or destroyed;—that, though the date of this agreement is left blank in the bill, it was made on July 1, 1849, which is the date of the deed; that after the completion of these houses the grantee in the deed delivered to his sister, Sarah Ann, the possession of her house;—that she lived in it, occupied it and rented it out and collected the rents of it; but that he did not make to her a deed for it, as he had agreed to do; that his nephew, the son of the plaintiff, being a minor, the plaintiff by the direction of William Tate Robinson rented the house, which under this written agreement had been built for him, and collected the rents until the 21st day of July, 1864, some twelve years;—that at that time William Tate Robinson executed to his only daughter, Anna M. Temple, then a married woman, she having married a second time, a deed for all his real estate, which had been. so given to him by his father, including the two houses and lots, which he held simply as a trustee for his nephew, the plaintiff's son, and for his sister, Sarah Ann Cline;—that Anna M. Temple, the grantee in this deed, has since married J. S. James, her second husband having died;—that up to the time of his making this deed to his only child William Tate Robinson never pretended to hold these two houses and lots except as trustee for said parties; that in an answer in a chancery suit brought against him by said John Robinson, his brother, he expressly so stated and further declared, that his agreement with his father was as above stated; that William Tate Robinson has since died intestate;—and that Anna M. Temple his daughter is his sole heir. The deed to

her, the bill alleges, was voluntary and therefore void as to the plaintiff, the sole heir of his deceased son James A. Robinson.

An attested copy of this deed is filed with the bill. It is dated July 21, 1864, states, that the grantee is of Pulaski county, Arkansas, that the consideration is $20,000.00 in hand paid, and contains no warranty of title. It was acknowledged in the clerk's office of Ohio county on September 23, 1864, and admitted to record.

George Robinson, receiver, demurred to the bill; and the court sustained his demurrer and dismissed the bill as to him on January 10, 1883. Anna M. James and John B. James answered the bill promptly. Their answer was excepted to, because it failed to answer or take notice of material allegations in the bill. The court sustained some of the exceptions to this answer; and the said defendants were required to make further and proper answer to the bill. They then filed an amended answer, which responded to all the allegations of the bill.

In this answer these defendants admit the death of William Robinson intestate at about the time mentioned in the bill leaving the heirs named in the bill. They also admit the deaths of all parties named in the bill as having died, adding, that William Tate Robinson died intestate on September 15, 1865, at Little Rock, Arkansas. They further admit, that prior to the deed to William Tate Robinson his father owned the real estate named in the bill, but deny, that it was worth $25,000.00 or near that sum. They admit, that Anna M. James is the only child and heir of W. T. Robinson. All the other allegations in the bill they deny except what appears from the exhibits filed with the bill, and what is said in the bill about the record in the case of *J. Robinson* v. *W. T. Robinson*, which, they say, they can not answer. They say, that William Robinson did not finish the houses named in the bill, as therein alleged; but on the contrary at his death only the foundation, the stone-work, was done; and that after his death his grantee, W. T. Robinson, built them at a cost of nearly $4,000.00. They also allege, that a few days after the death of W. T. Robinson on Nov. 15, 1865, the plaintiff, James H. Robinson, brought a suit against the

estate of W. T. Robinson and against his daughter, Anna M. Temple, for over $32,000.00 and attached all the real estate conveyed to her by the deed of July 21, 1864, as property of W. T. Robinson at his death including the two houses and lots now alleged to be the property of the plaintiff's son and of his niece, which, the plaintiff now alleges, W. T. Robinson held simply as trustee;—that George Robinson, the plaintiff's brother, was appointed by the court receiver in the suit, and that he received the rents of all this property including the two houses now pretended to have been held by W. T. Robinson as trustee, and that he continued to receive these rents, till a final decree was rendered in the cause in February, 1882, whereby the plaintiff recovered $6,467.99 and the costs of the suit amounting to $1,000.00, which was paid to the plaintiff out of the rents and profits of the lots now sought to be recovered in this suit, as ordered to be paid to him by the court.

The defendants in this answer rely upon the statute of limitations and the staleness of the plaintiff's demand as a defence. They allege, that the son of the plaintiff did not die unmarried but left a widow but no child; and they aver, that he was over thirty years old, when he died; but they admit, that his widow can have no interest in the subject-matter of the suit.

This answer was replied to generally.

The suit of *John Robinson* v. *W. T. Robinson* referred to in the bill was a suit for the partition of the land of W. Robinson after his death among his children; and it is alleged in the bill, that the said deed of July 1st, 1849, was a forgery, and that it had been fraudulently acknowledged by some one personating William Robinson and was thus recorded, and that he never knew of its existence in his lifetime, but it was concealed from him by W. T. Robinson, the pretended grantee, who never paid a cent for the real estate. W. T. Robinson in his answer to this bill says:—

"Respondent denies the allegation, that no part of the consideration of said deed has been paid. On the contrary he charges, that the notes have been made and delivered to said William Robinson; and said moneys were paid to said William Robinson and his agents except a small balance, which

was disposed of as follows, to wit : The said William Robinson agreed to erect the tenements on certain lots, and that then this respondent was to make deeds for said ground, on which two of said buildings were erected, viz. : a deed of one of said buildings to James A. Robinson, son of James H. Robinson and grandson of William Robinson, and a deed for the other to Sarah Ann Cline, daughter of said William Robinson (though respondent charges, that he, respondent, had after said William Robinson's death to erect said tenements at great cost to him); and the said respondent was to have the other house. And thus the entire amount was paid in full and more than paid by this respondent having to build said houses himself, whereas the said William Robinson agreed to erect them at his own expense ; so that said complainant, John Robinson, has no claim whatever to said property or to the consideration."

The suit referred to in the answer of the defendants in this cause as the suit brought by James H. Robinson, the plaintiff, is in its general objects and in its results correctly set out in the answer of the defendants. Anna M. Temple, then Anna M. Boner, in her answer says, she is informed and believes, that the conveyance by her father W. T. Robinson to her, then Anna M. Temple, dated July 21, 1864, referred to in the bill "was not made without consideration; for there was not only the love and affection of a father for his only child, but there was paid to the said W. T. Robinson the consideration of a cotton crop worth $3,000.00 or more transferred by her former husband Isaac B. Temple now dead to said W. T. Robinson, her father, and that as she is informed and believes and charges the fact to be, he was paid by her former husband the sum of $2,500.00 in money."—This was sworn to by her.

A deposition of one James Thompson was taken in the suit of *James H. Robinson* v. *The Administrator of W. T. Robinson. Anna M. Boner and others*, Anna M. Boner being the same person as Anna M. Temple, one of the defendants in the cause, which we are now considering. In this deposition James Thompson says, that W. T. Robinson told him, that he had made a deed conveying all his real estate to his daughter, Anna M. Temple, on July 21, 1864, to pre-

vent Henry Robinson from making anything out of a suit he had brought against him, W. T. Robinson, in which suit Henry Robinson was trying to cheat him; but he would never get anything, as he had made over all his property to his daughter Anna M. Temple.

These records are filed as exhibits in this cause, and the deposition of James H. Robinson was taken, which proves, that the written agreement spoken of in the bill made by William Robinson with W. T. Robinson, at the time the deed of July 1, 1849, was made, was such as he states in the bill, and that it was made and executed in his presence, no one else being present but the parties; that it was written by W. T. Robinson, and, after it was executed, was handed to William Robinson. This was done, at the same time the deed was drawn, June 30th, 1849, though the deed and agreement were dated July 1, 1849. The witness heard W. T. Robinson read this agreement to his father William Robinson. It provided, that W. T. Robinson should build the three houses and, when they were completed, convey one of them with the lot, on which it was built, to Sarah Ann Cline and one to James A. Robinson, son of the witness, as a part of the consideration for all of his father's real estate. There was nothing said about the cost. The agreement was, that W. T. Robinson was to build them, which he was unable to do, and the witness finished them for him. Witness states, that the cost of building the three houses was about $1,500.00. (This is much less than the estimate of the cost made by George Robinson, who in his deposition states, that two of these houses cost $4,500.00 or $5,000.00). He also deposes, that W. T. Robinson gave to Mrs. Cline the possession of her house, when it was finished, and the possession of the other, when it was finished, he gave to James A. Robinson; and that in this last house the witness lived for two years, till his wife died, and then he rented it and collected all the rents, W. T. Robinson collecting only the rent of the third house, which belonged to him; that Mrs. Cline lived in her house some time and then went to Pennsylvania to live and rented out her house, the witness collecting the rent for her for one or two years; and afterwards the rents were attached by some creditor of W. T. Robinson.

This witness further states, that he heard the name of Mrs. Cline and his son read out of the agreement between William Robinson and W. T. Robinson on June 30, 1849, as the persons, to whom two of these houses when built were to be conveyed.—He also states, that he can not tell when his son, James A. Robinson was born—His wife was divorced from him and took away the bible in which his son's birth was recorded—But he says, he was between twenty-six and twenty-eight years old, when he died, and it is stated in the bill and admitted in the answer, that he died December 2, 1879. So, if his age is correctly stated by his father, he was born between December 2, 1851, and December 2, 1853, or two or three years after, it is said, that this agreement was made, whereby this house was to be conveyed to him, and in which he is described by his name James A. Robinson. He says—he never told his son, that this house and lot was to be conveyed to him, and that he kept no account of the rents and profits of the property, and never was the guardian of his son.   He says, that he often asked W. T. Robinson to make this deed to his son James A. Robinson but could not get him to do it, as he would always put it off; that W. T. Robinson paid the taxes on this property, and when he, the witness, paid them, he charged them to W. T. Robinson; that he was W. T. Robinson's clerk and sometimes in his absence collected his rents:—that W. T. Robinson left Wheeling in 1864 having nothing at all even to get the necessaries of life.

George Robinson deposes, that as receiver of the court in the case of *James H. Robinson* v. *William T. Robinson* he paid the amount of the judgment in favor of James H. Robinson, $6,467.99, and more than $1,000.00 costs out of the rents of the real estate conveyed by William Robinson to W. T. Robinson on July 1st, 1849, including the rents of these two houses; that these houses were in that suit attached by James H. Robinson as the property of W. T. Robinson, then living in Arkansas;—that he has collected the rents of these houses ever since 1862, first as agent of W. T. Robinson up to February, 1866, and thereafter as receiver of the court.

The defendant, Anna M. James, testifies, that the consideration paid for the conveyance to her by her father, W. T.

Robinson, of all his property in Wheeling was $2,500.00 in cash and twenty-five or thirty acres of cotton standing in the field;—that the money was paid to him by her husband in Wyatt Temple's house five miles from Little Rock in Arkansas;—that, when the contract was made, whereby her husband bought all her father's real estate in Wheeling, the cotton was worth according to her estimate $10,000.00 or $12,000.00;—that the deed was made to her, because her husband was in the Southern army and was in danger of being killed;—that there were several persons present, when the contract was made; but they are all dead now. I do not deem it necessary to state more of her deposition. It was taken to prove the *bona fide* purchase for a fair and valuable consideration of all the real estate in Wheeling conveyed to her father, W. T. Robinson, by the deed dated July 1st, 1849, without any knowledge, that he held any part of it by secret trust in favor of the plaintiff's son or any one else.

According to the view, I take of this case, it is immaterial, whether she was or was not such *bona fide* purchaser; and therefore I need not state all the evidence on the question.

This cause was finally heard on the pleadings and evidence on the 3d day of September, 1884, and the court dismissed the bill at plaintiff's costs.

From this decree an appeal was granted on the petition of the plaintiff.

*W. H. Arnett* and *H. M. Russell* for appellant.

*W. P. Hubbard* for appellees.

GREEN, JUDGE :

The bill in this case alleges, that on the 1st day of July, 1849, William Robinson, the father of the plaintiff, made an agreement in writing for a valuable consideration to transfer all his real estate to his son, William Tate Robinson, who has since made a voluntary deed of all this real estate to his daughter, one of the defendants ;—that by this agreement William Tate Robinson agreed, that he would, as soon as William Robinson had erected three brick dwellings on three adjoining lots, part of the real estate to be conveyed to him

by an absolute deed, convey one of the same with the house thereon to James A. Robinson, the son of the plaintiff, who has since died intestate leaving the plaintiff his sole heir, and one to William Robinson's only daughter;—that this creates an express trust and make the plaintiff's son the equitable owner of the lots from the time these houses were completed, about March, 1852. The bill seeks to have this express trust executed and a deed for one of these lots made to the plaintiff, as the sole heir of the *cestui que trust*, James A. Robinson.

There is no direct proof of this written agreement except the deposition of the plaintiff. And, as William Tate Robinson died in 1865, and William Robinson died long before that, it is obviously very important to determine, whether the evidence of the plaintiff is admissible, so far as he testifies, that this written agreement was made and executed in his presence, and undertakes to give its contents, stating that it has been lost or destroyed. Of course this evidence is inadmissible, both because he is a party to the cause, and because he is testifying about a matter, in which he has a direct interest, unless it is made admissible by our statute-law, which is found in Warth's Am. Code, chap. 130, sec. 23, p. 724, and is as follows:—

"No person offered as a witness in any civil action suit or proceeding shall be excluded by reason of his interest in the event of the action suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding nor any person interested in the event thereof nor any person, from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination deceased, insane or lunatic against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such deceased person or the assignee or committee of such insane person or lunatic. But this prohibition shall not extend to any transaction or communication, as to which any such executor, administrator, heir at law, assignee, devisee, survivor or committee shall be ex-

amined on his own behalf, nor as to which the testimony of such deceased person or lunatic shall be given in evidence."

Now eliminating from this statute the many distinct and separate matters, which are united in one sentence, the substance of the provision, so far as it bears on the question before us, is as follows:—No party to an action shall be examined as a witness on his own behalf in regard to any personal transaction or communication between such witness and a person at the time deceased against the assignee of such deceased person. Here a party has been examined on his own account against a defendant, the assignee of W. T. Robinson, deceased at the time of such examination. The only question is : Was the part of his evidence, which I am now considering, "in regard to any personal transaction or communication between such witness and" the defendant's assignor, W. T. Robinson, deceased ? In New York, where the statute provides, that no party shall be examined as a witness in regard to any transaction had personally between the deceased and the party, Judge Rosekrans said in *Simmons* v. *Sisson*, 26 N. Y. 277 :

" The prohibition of that section does not prevent a party testifying in an action, in which the legal representatives of a deceased person are parties to a conversation between the deceased and a third person, which was overheard by the witness. The hearing of such conversation is not a transaction had personally between the deceased and the party within the meaning of the section of the Code referred to. This language has reference only to business done or negotiations carried on in person between the deceased and such party. That this is the true construction of the language is evident from the amendment of this section of the Code in 1862, which inserted the words ' conversation ' before the word ' transaction ' ; so that the section now prohibits a party testifying in such an action in regard to any conversation or transaction had personally between the deceased person and such party. Even as the section now stands, it does not prohibit a party testifying to a conversation between the deceased and a third person heard by a party, in which he did not participate."

This last remark was confessedly an *obiter dictum;* and Judge Haymond in *Owens* v. *Owens,* 14 W. Va. 96, 97, says of it:—

" In that case Rosekrans, Judge, stated as his opinion, that section 399 of the Code of New York of 1862 did not prohibit a party sued by an administrator from testifying to a conversation heard by him between the deceased and a third person; that the hearing of such conversation is not a transaction between the deceased and the witness, nor is such evidence prohibited by the Code of New York of 1862. This I do not understand from the case as having been decided by the court but simply as the opinion given by one judge. I must say without intending to express a fixed opinion, that it appears to me now, that the judge in his opinion as expressed seems to attach great importance to the strict letter of the law."

In that very case our Court gave a far broader construction to the words "personal transaction between such witness and a deceased person;" for these words in our statute were interpreted to prohibit the plaintiff in an action of *assumpsit* from testifying in her own behalf as to her work and labor and services rendered for the deceased. Now much of the work, labor and services was performed, when the deceased was not present; yet as it came within the spirit of our statute, and equally within the spirit of the New York statute, such testimony was held by us to be inadmissible, it being in regard to a "personal transaction between the witness and deceased." A broad and liberal construction should be given to the words " personal transaction," if we would carry out the spirit of this law; and our decisions have so construed these words in this respect going farther than the New York Court. In *Seabright* v. *Seabright,* 28 W. Va. 461, this Court said:—

"The general principles to be deduced from our decisions are, that the statute, which removes the disability of a party to testify, which by the common law attached to a party to a suit and to any person having a direct interest in the event of a suit, with the exception that such disability as to such person should continue as at common law, if his testimony was in regard to any personal transaction or communication

between such witness and a deceased person, and the testimony of the witness was against certain specified persons, so far as the exception continuing the disability of such witnesses in certain cases is concerned, should be liberally construed to avoid the evils, which it was apparent must have resulted but for such exception. * * * * For in such case, as the decedent could not be heard as to such transaction or communication had with him personally by such party or interested person, it would be unsafe and not tend to promote justice, to hear the testimony of the living and interested party to such transaction or communication, the temptation to perjury, when generally there would be no means of proving it, being in such a case so great as to render it unsafe to allow such testimony to be given.

"Our Court in view of the great difficulty, which exists, to find language, which would under all circumstances effect the object, which the legislature apparently had in view, has construed the language actually used in the statute-law liberally with a view to suppress the evil, which this exception to the removal of these common law disabilities was designed to avoid. Thus the words ' personal transactions ' or communication between such witness and a decedent have been given a broad interpretation. "

The following cases are referred to as sustaining these views : *Owens* v. *Owens,* 14 W. Va. 88 ; *Caldwell* v. *Prindle,* 11 W. Va. 321 ; *Anderson* v. *Cranmer,* 14 W. Va. 562–576. In this last case it was decided, that conversations held with the deceased person at any time though not on the subject in controversy, but which simply tended to prove facts, which would go to show, that the subjects in controversy should be decided against the representatives of the deceased person, could not be proven by the witness.

Following the spirit of our decisions I must condemn the views expressed by Judge Rosekrans in *Simmons* v. *Sisson,* above quoted, as unsound. They were expressly overruled by the Supreme Court of New York in the case of *Lobdell* v. *Lobdell,* 32 How. Pr. Rep. 1. On page 13 the Court says :—

"The present action is by the heirs at law of Seymour Lobdell, and it is against the devisees of Pliny Lobdell. The devisee of the land is offered as a witness to prove a con-

versation between Pliny and Seymour, and in which he took part, for the purpose of defeating the title of the heirs of Seymour and establishing his own title.   In my opinion the offered evidence was properly excluded.

" The object of the evidence was to show by the declarations or confessions of Seymour Lobdell facts tending to defeat the title of the plaintiffs, his heirs.   The defendant, witness, participated in the conversation; but in my opinion, if he had taken no part in the conversation, he would not have been permitted to give evidence of the conversation of these deceased parties.   This question is also in the case of George Lobdell, another defendant and devisee, who was a witness; and the offer was made to prove by him a conversation in his presence between Pliny and Seymour about the terms, upon which the latter entered upon the land in question.   In this offer nothing is said of the witness taking part in the conversation.   In my opinion it is not material whether the witness took part in the conversation or not.   The broad objection is, that he proposed by his evidence of the confessions or declarations of the deceased father of the plaintiffs to defeat their title as heirs at law and to establish his own title, he being a defendant.   It may perhaps be said, that the case does not come 'literally within the words of the statute'—any transactions or communication had personally by the witness with the deceased father of the plaintiff, but in my opinion it is within the intention of the statute.   The mischief to be guarded against is obvious.   We are referred to *Simmons* ag't *Sisson*, 26 N. Y. 276, in which it was held, that a conversation between the deceased and a third party, overheard by the defendant, might be proved by the defendant as a witness—that the hearing of such conversation was not ' a transaction had personally between the deceased and the party' within the meaning of the Code.   After the trial of that cause the Code was amended by inserting ' or communication ' after the word ' transaction.' In that case Justice Rosekrans took notice of the amendment of 1862 and remarked, that ' even as the section now stands, it does not prohibit a party testifying to a conversation between the deceased and a third person, heard by the party, and in which he did not participate.'   This was *obiter*.   In

the case under consideration both the parties to the conversation are dead. The witness claims title under one of them, and the plaintiffs under the other and against the party deceased, under whom the witness, defendant, claims."

All the judges of the Supreme Court concurred in this opinion; but the decision was reversed by the Court of Appeals (36 N. Y. 333). But in my opinion the reasoning of the Supreme Court is more in accord with the spirit of our decisions as hereinbefore stated than is that of the Court of Appeals. I therefore adopt the reasoning of the former, as quoted above, as my opinion. There is, I think, no real difference in the intent of the law between a conversation had between the defendant and a third person in the presence of the plaintiff, which he overheard, and such a conversation, in which he took part. The same reason exists for excluding the evidence in the former as in the latter case. In *Seabright* v. *Seabright* we gave as the reason for excluding the evidence in the latter case, that " the temptation to perjury, when generally there would be no means of proving it, is in such a case so great as to render it unsafe to allow such testimony to be given. "—In the former case the temptation would be just as great, and, all the persons present at the conversation being dead except the witness, it would be impossible to prove except by him, whether he took part in the conversation or not.

The evidence of the plaintiff therefore with reference to the contents of the agreement of June 30, 1849. must be excluded as incompetent. And it is even clearer, that almost all his evidence is incompetent, because it refers to transactions between himself and William Tate Robinson, the assignor of one of the defendants. It is unnecessary to designate every part of his testimony, which for this reason is incompetent. I will specify only his statement, that he very often called on William Tate Robinson to convey the house and lot named in the agreement to his, the plaintiff's, son James A. Robinson, and that William Tate Robinson always put him off; but that with William Tate Robinson's concurrence he always collected the rent of this house for his son, though he was not his son's guardian and never accounted with his son for this rent nor mentioned to him,

that he was entitled thereto. There is much else in his evdence, which consists of transactions, communications and conversations held personally with William Tate Robinson, deceased, which is not competent evidence ; and if all this is excluded the plaintiff has entirely failed to make out any case, unless, as he contends, he can make out a case from the statements made by W. T. Robinson in his answer in the cause of *John Robinson* v. *William Tate Robinson and others.*

That the temptation to perjury in this case is so great as to render it unsafe to allow the plaintiff to testify as to transactions, communications and conversations, which occurred in the presence of the plaintiff only between W. T. Robinson, the assignor of one of the defendants, and William Robinson, both of whom are deceased, is well illustrated in the deposition of the plaintiff. As a specimen of what is obviously false testified to by him I may cite his statement, that this agreement between William Robinson and William Tate Robinson made in his presence contained a provision, whereby W. T. Robinson agreed to convey to James H. Robinson's son naming him a certain lot, as soon as the house on it should be completed, when by his own testimony on cross-examination it appears, that at that time he had no son, and that this son, who he testifies, was named in the agreement, was not born till at least two years after the time, he says, he heard this agreement read ;—his statement in the bill, that this written agreement had been in his possession and was lost or destroyed, while the necessary inference from his depositions is, that it never was in his possession, he pretending only to have heard it read and to state its contents;—his further statement, that he repeatedly called on W. T. Robinson to convey this lot and house to his son, James A. Robinson, as his undisputed property,—taken in connection with his affidavit, when he sued out an attachment for a debt, that W. T. Robinson owed him, that this house and lot was the property of W. T. Robinson, and the fact that his judgment in this suit was paid by the receiver of the court out of the rents of this very house and lot;—his statement in the bill, that by the terms of this pretended agreement William Robinson was to build on three adjoin-

ing lots three brick dwellings and his testimony, that by the
agreement W. T. Robinson was to build them;—his testi-
mony, that he advanced most of the money to build these
houses, and that all three of them cost $1,500.00, while
George Robinson, a disinterested witness, who knew the
houses well and gave a minute description of them testified,
that according to his estimate two of them cost $4,500.00
or $5,000.00, making the cost of the three four or five times
that testified to by this plaintiff, which estimate of George
Robinson's is sustained by the fact that each of the houses
rented for $150.00 to $250.00 a year. This deposition con-
tains a further statement, that as the father of James A. Rob-
inson, the equitable owner of one of these houses, he with
the concurrence of William Tate Robinson always collected
the rent of this house, while George Robinson states, that as
agent of W. T. Robinson he collected the rent for more than
three years. His statement, that he collected the rent of an-
other of these houses for Mrs. Cline, is in all probability
false; for, though he says she is living, he does not take her
deposition. And though in the said attachment-suit he re-
ceived in payment of his judgment the rent of this very
house, which, he says, W. T. Robinson regarded as Mrs.
Cline's, yet he says not one word about her objecting to the
rents being applied to the payment of W. T. Robinson's
debts. This will suffice to show, that it is unnecessary to
consider what portion of his testimony was competent and
what not; for if it were all admitted, he could not prove his
case, as he is evidently unworthy of belief on oath when tes-
tifying in his own interest.

It only remains to consider, whether the statements of
William T. Robinson in his answer in the cause of *John
Robinson* v. *William Tate Robinson* brought for the partition
of the real estate of William Robinson are sufficient to make
out a case for the plaintiff. William T. Robinson in said an-
swer says, that he " is the absolute and *bona fide* owner of
all the real estate in said deed of July 1, 1849." He further
says, that " he wrote said deed either on Saturday, the 30th
day of June, 1849, or on Monday, the 2d day of July, 1849 ;
and said William signed and delivered said deed to respond-
ent on same day in the presence of James H. Robinson in

the store of James H. Robinson in the evening. The respondent then handed said deed to James H. Robinson and requested him to get two justices of the peace to take said William's acknowledgment to said deed, which he promised and attempted to do, but afterwards stated to respondent, that he had failed in one or two efforts to get two justices together and neglected and forgot to attend to it, and that said deed remained unacknowledged till the 26th day of February, 1851, when said William acknowledged the same before two justices. Respondent denies the allegation, that no part of the consideration of said deed has been paid; on the contrary charges, that the notes were made and delivered to William Robinson; said moneys were paid William Robinson and his agents except a small balance, which was disposed of as follows, to wit: The said William agreed to erect the tenements on part of one-half and a fraction of lot No. — and then that this respondent was to make deeds for said ground, on which two of said buildings were to be erected, viz., a deed for one of said buildings to James son of James H. and grandson of said William, and a deed for the other to Sarah Ann Cline, daughter of said William Robinson (though respondent now charges, that he, respondent, had after said William Robinson's death to erect said tenements at great cost to him) and that said respondent was to have the other house; and thus the entire amount was paid in full and more than paid by this respondent having to build said houses himself, whereas the said William agreed to erect them himself at his own expense; so that the said complainant has no claim whatever to said property or to the consideration."

He afterwards states, that the said "William commenced the erection of said buildings agreed upon by them but never finished." This is stated to account for the fact, that William after this deed made improvements on real estate conveyed by him to William T. Robinson. This answer was sworn to by William Tate Robinson.

These are the statements relied on by appellant's counsel as proving the allegations of his bill. They prove, it seems, nothing in the least resembling these allegations. If they prove anything, they prove, that James H. Robinson thought

31

that with the aid of his false testimony he might make out a good claim as heir of his son for one of these houses. Unfortunately for the success of his scheme he had to give the alleged agreement the same date as that of the deed, July 1, 1849, or rather June 30, as the 1st day of July was a Sunday, which was two years before the birth of the son, named in the alleged agreement, and for whose benefit it was drawn, and to avoid a legal difficulty he had to assert and prove, that the agreement was in writing. In his bill he states, that his son died December 2, 1879; and in his deposition he states, that he was then between twenty-six and twenty-eight years of age. According to his own statement his son could not have been born before December 2, 1851; but as W. T. Robinson in his answer, which was sworn to, refers to an agreement made with William Robinson to convey on certain conditions a house and lot to James A. Robinson, it is obvious that said James A. Robinson must have been born before the 16th day of June, 1851, the day of the death of his grandfather, probably a short time before. This agreement therefore instead of being made, as alleged in the bill in this cause, on the 30th day of June, 1849, was necessarily made at some time between the birth of James A. Robinson and the death of William Robinson.

We must assume as against the defendant in this case, that some such agreement was made; for W. T. Robinson, his assignor, in his answer in the cause of *John Robinson* v. *W. T. Robinson* swore to it, and as we have seen, it must have been made shortly before June 16, 1851. The evidence of the plaintiff in this cause corroborates this. He says, that the stone-walls of the basements of the houses were in no place more than four feet high, and that at the death of William Robinson none of the walls were finished and that no other work was done on the houses. This shows, that the agreement to build them was made a short time before the death of William Robinson, not nearly two years before as now pretended by the plaintiff in this cause. Moreover it is obvious, that this agreement was verbal; for if it had been in writing, W. T. Robinson in his answer, which was sworn to probably within eighteen months after the making of the agreement, would have said it was in writing and would

have filed it with his answer, as it would have shown conclusively the falsity of the bill and caused it to be dismissed. The answer shows not only, that the agreement was verbal but also that it was made long after the deed was made to him; for it alleges that the consideration, which W. T. Robinson was to pay for the real estate, was except a small balance paid in notes. Now the last of these notes was not due till January 1, 1851; and it is fair to infer, that this verbal agreement was made after that note fell due. And what does this verbal agreement amount to according to the statement of W. T. Robinson in his answer?—Only this, that William Robinson was to build on the land of W. T. Robinson three brick houses, one of which was to belong to W. T. Robinson, in consideration for which he was to convey the other two houses with the land, one to James A. Robinson and the other to Sarah Ann Cline. In other words it was simply an agreement on the part of William T. Robinson to sell two vacant lots to William Robinson and convey them, as he directed, for about $4,500.00 to be spent by William Robinson in building a dwelling-house for William T. Robinson. William Robinson died shortly after without having paid the consideration for these two lots.

It is obvious, that the courts after thirty years will not specifically enforce such a contract, a very trifling part of the consideration having ever been paid. The case of *Titchenell* v. *Jackson*, 26 W. Va. 460, relied on by the appellant's counsel, has not the slightest resemblance to the case proven here, though it would have borne some resemblance to it, if there had been a written agreement, such as was stated in the bill, made at the time the deed was made to W. T. Robinson. Had this been proven and a suit brought with some degree of promptness, the agreement might have been enforced against the holder of the legal title in favor of the *cestui que trust* in these two lots, though William Robinson had not carried out his part of the agreement, and provision might have been made to place William T. Robinson in the position, he would have occupied, had William Robinson performed his part of the contract. If this had been the case, and the suit had been brought promptly, it is possible, the court might have given the plaintiff

some relief; but I do not say, that even then it would have done so; for the case would still have been very different from the case of *Titchenell* v. *Jackson*. But in this case the plaintiff has not only utterly failed to prove the case stated in his bill, but he has even failed to prove any case, which would entitle him to relief.

Of course it is unnecessary to consider, whether Anna M. James did or did not give a valuable consideration for the lands, her father conveyed to her. I will only say, that it would require a large amount of charity to conclude, that she could honestly have deposed to the value of the cotton-crop given in part consideration for this real estate. She valued it in her deposition at from $10,000.00 to $12,000.00, while in her answer in this cause she estimates it at $3,000.00 and this was probably an exaggeration, if indeed the whole story of a cotton-crop is not a mere fiction. The deposition of James Thompson to prove the deed fraudulent copied into this answer is of course not admissible evidence. I regard the whole case of the plaintiff as a fiction gotten up with the supposition, that with what was said by William T. Robinson, probably with a fraudulent purpose in his answer to the bill filed by John Robinson supplemented by falsehoods sworn to by James H. Robinson a case might be made out.

The court below did not err in its decree dismissing the plaintiff's bill at his costs. The decree must therefore be affirmed and the appellees must recover of the appellant their costs in this court expended and thirty dollars damages.

AFFIRMED.