S. W. SCOTT, Appellant, v. CLYDE E. BRENTON, Administrator, et al., Appellees.

APPEAL AND ERROR: Abandonment of Appeal. The defendant who takes an appeal after the plaintiff has perfected his appeal, but argues on appeal solely for an affirmance of the judgment of the lower court, in effect abandons his appeal.

EVIDENCE: Transactions with Deceased—Competent and Incompetent on Same Issue. Prejudicial error cannot be predicated on the reception of evidence of personal transactions with a deceased person, within the meaning of Sec. 4604, Code, when the matter in issue was fully established by other competent evidence. (Equity case.)

WITNESS: Competency—Personal Transaction with Decedent— Burden of Proof. The court will not *presume* that certain testimony constitutes or is a part of a personal transaction with a deceased person within Sec. 4604, Code. Such fact must appear from the circumstances, or the objecting party must show it.

PRINCIPLE APPLIED: Plaintiff claimed that he and his mother had entered into a certain written contract 15 years prior to her death, the loss of which contract was sufficiently shown. He testified: ''Boyd (probably a scrivener) was at mother's farm in 1903 in her lifetime. I saw a paper in his possession that day which he had drawn. The signatures of Margaret N. Scott and S. W. Scott were attached to it. I knew her handwriting. That signature was in her handwriting. The signature of S. W. Scott was in my handwriting. Boyd put the paper into an envelope and took it away with him. Across the face of the envelope .I saw the signatures of Margaret N. Scott and S. W. Scott in their handwriting. I read that instrument.'' Plaintiff then testified to the contents of the instrument. *Held*, the testimony was not inadmissible under Sec. 4604, it not appearing that what plaintiff testified to was knowledge acquired *at the time of the execution of the contract* or that the mother was present. (The question here decided is conceded to be close to the border line.)

HOMESTEAD: Descent—Incumbrance by Widow—Right of Heirs. Sec. 2985, Code, providing that the homestead, in case there is no surviving parent, descends to the children of such parent

exempt from any antecedent debts of the parent, does not prevent the parent, during his or her lifetime, from charging the homestead with his or her debt by proper contract.

*Appeal from Dallas District Court.*—HON. LORIN N. HAYES, Judge.

SATURDAY, DECEMBER 19, 1914.

ACTION in equity. In the first count of the petition, plaintiff claims compensation for services rendered under and by virtue of a written contract between himself and his mother, Margaret N. Scott, now deceased, and asks that the court determine, as against the administrator, the amount due on his claim, and that the amount found due be established as a lien upon sixty acres of land, the fee title to which was in the mother. Forty acres of this land was her homestead. In a second count, plaintiff claims compensation upon a verbal contract for similar services for which he was to be compensated at reasonable value. The trial court found plaintiff entitled to recover $9,075.00, and that plaintiff is entitled to have the recovery established as a lien upon twenty acres only of the land. From that part of the judgment and decree refusing to establish a lien upon the homestead, plaintiff appeals. A further statement of the facts appears in the opinion.—*Modified* and *Affirmed*.

*White & Clarke,* for appellant.

*Dingwell & Clarke,* for appellees.

PRESTON, J.—I. Defendant, Brenton, is the administrator, and the other defendants are sons and daughters of Margaret N. Scott, who died intestate January 16, 1913, aged about eighty-five years. She was a widow at the time plaintiff came on the farm to perform services for her in 1903. Plaintiff is a son of deceased. The other children left home some years before the death of the mother, one of them twenty-eight years before. Plaintiff remained unmarried and for

about fifteen years cared for his mother. There can be no question but that he faithfully performed his duty as a son and so performed his part of the contract. For some years after 1903, the mother acted as housekeeper. The last few years of her life, she became feeble in body, and to some extent in mind, so that plaintiff employed other help to assist him in taking care of her. Defendants filed a counterclaim asking $9,389.00 for the use by plaintiff of the premises and for services of deceased as his housekeeper.

After plaintiff appealed, defendants served a notice of appeal, but they make no argument for a reversal as to the findings of the trial court in allowing plaintiff's claim or disallowing the counterclaim, but argue propositions relied upon for affirmance upon plaintiff's appeal. This being so, no further attention is required as to the appeal of defendants. Nor is it necessary to further discuss the character of the services rendered, the amount of recovery or the lien on the twenty acres. The only question for determination is as to whether plaintiff is entitled to a lien upon the forty acres. It should be said that deceased left no other property out of which plaintiff's claim could be made except the sixty acres of land, and the twenty acres is not sufficient to pay the claim.

1. APPEAL AND ERROR: abandonment of appeal.

We are of opinion that the written contract was established and will refer to the evidence bearing upon that point. As we understand the record, the trial court so found, but concluded that, notwithstanding this, plaintiff was not entitled to have the recovery made a charge upon the homestead. The written contract was lost. It is contended by defendants, and admitted by plaintiff, that under such circumstances it must be shown by satisfactory evidence that the written contract was executed as pleaded, its loss and the material parts thereof. The petition alleges the written contract as follows:

"THIS AGREEMENT Made and entered into this ........ day of ................, 1903, by and between Margaret N Scott and S. W. Scott.

"WITNESSETH: That the said S. W. Scott promises and agrees to properly care for and maintain the said Margaret N. Scott during her lifetime, furnish her comfortable board, clothing, care and medical attendance and carry on for her and develop and improve her farm for the compensation of Fifty Dollars a month, beginning with the 1st day of December, 1896, and extending during the lifetime of the said Margaret N. Scott.

"It is further mutually agreed that the products of said farm and the labor of said S. W. Scott shall be used for their joint support and maintenance during the said period, and that the said compensation shall be paid to the said S. W. Scott at the death of the said Margaret N. Scott out of the proceeds of the sale of the South East Quarter of the North West Quarter, and the West One-half of the South West Quarter of the North East Quarter of Section Sixteen (16), in Township Eighty (80) North, of Range Twenty-seven (27) West 5th P. M., Iowa, and shall be a charge upon said real estate until the same is paid.

"IN WITNESS WHEREOF, the said parties have hereto set their hands the date last above written.

> "Margaret N. Scott.
> "S. W. Scott."

The evidence bearing upon this point is substantially this: Witness McQuie testifies to a conversation with deceased in which she stated that she was getting feeble, and he suggested to her that she ought to get her business matters in shape, and she stated that things were all right; that she had made a paper or contract whereby plaintiff would be benefited.

Plaintiff, as a witness, testified on this point, over objection by defendants. The objection to each question was as follows:

"Objected as incompetent, irrelevant and coming within the prohibition of Section 4604 of the Code."

The objection seems to have been to the testimony and not to the competency of the witness. But appellant makes no point that the objection is not sufficient.

Plaintiff testified: ''I was acquainted with H. E. Boyd in his lifetime; he died in November, 1912; he was at the farm occupied by myself and my mother in her lifetime; it was in September, 1903; I saw a paper that had been drawn up by him in his possession on that day; it was in his hand-writing. When I last saw the paper on that day the signa-tures Margaret N. Scott and S. W. Scott were attached to it; I was acquainted with her handwriting; that signature was in her handwriting. The signature S. W. Scott was in my handwriting. Boyd put the paper with the signatures so attached in his pocket; he doubled it up and put it in the envelope; I saw him seal it; after he sealed it I noticed appear-ing across the face of the envelope the names Margaret N. Scott and right below it S. W. Scott; the handwriting thereof was of Margaret N. Scott and S. W. Scott; the envelope was taken away by Mr. Boyd; I read that paper in the hand-writing of Mr. Boyd bearing signatures I have testified about; the substance of the paper was that I was to take care of her as long as she lived and stay there and take care of her and she would give me $50.00 per month until she died, from 1896; to take care of her and maintain her and furnish her anything she wanted, buy the food and pay the doctor's bills if she was sick. She was to pay out of that place after she was gone. She had no property except this farm of sixty acres at that time. I have made an effort to find that con-tract. We went to Perry and two or three different offices where Mr. Boyd was supposed to have papers, but was unable to find it. We were aided in the search for the papers by Mr. Boyd's son and members of his family. We examined where his papers were supposed to be at Perry and at home. Boyd died before my mother. We made the search after my mother's death and before her death. We examined all of his papers and where he kept his papers. I saw that envelope

that Mr. Boyd took away in his possession at Minburn some four or five years after it was executed and in his lifetime in his office. It was not open at that time, but I saw the outside of the envelope. My mother was not present at that time. At that time I saw the signatures Margaret N. Scott and S. W. Scott in her handwriting and mine across the envelope. That was the envelope Boyd took away at the time testified to by me and is the envelope I was trying to find. I do not know where it is at this time."

Eleanor Reney testifies that she was in the home of plaintiff and his mother from October, 1911, until the day before Christmas, 1911, doing housework and taking care of deceased; that deceased required unusual care because she had bowel trouble; there was no one else in the family at that time except plaintiff, his mother and witness; that plaintiff assisted in taking care of her, and when he was there he did most of it; that deceased said to her at one time, "You will not have this to do a great while for I am going. I wish you would promise to stay after I am gone and do the housework and stay with Sammie." I says, "Perhaps Sammie won't have any place to stay when you are gone; this place will be divided among the other children," and deceased said, "I want Sammie to have the place; he has enough coming to him; he has got more coming to him today than the value of this place because I am giving him $50.00 a month since he came here." Witness says deceased told her how much it amounted to and had it all figured up, and she says, "He has got enough coming to him to pay for this place; I want Sammie to have this place." She said, "We had the papers," and witness asked her if they were in the bank, and deceased said they were as safe as a bank, and further, "I let Boyd have the papers and when I died he was to give Sammie his rights." She testifies that deceased told her about the contract two or three times. Witness further testifies that she did not consider Mrs. Scott erratic in her statements; that she regarded

her as nervous; did not think she was insane; that she was fairly sound for a woman of her age; that she had some hallucinations after she had a nap.

We have referred to the physical and mental condition of deceased briefly in this way as it may have a bearing upon the weight to be given to her statements, and not for the purpose of showing the value of the services rendered by plaintiff. There was some other evidence of this kind.

Esther Long, who helped care for deceased from November 7, 1912, until her death, testifies to her condition physically and mentally; that at one time deceased was talking about how it worried her to have to be taken care of and said she would not be here long; that she wanted witness to stay and keep house for plaintiff, and said, "Sammie will be provided for; the farm will be left here, and he gets $50.00 a month, and that will come out of the sale of the farm, and Sammie will have pay; he has been getting wages for fifteen years." She said he was to get that at her death. She often mentioned the same matter; that plaintiff paid her for her services, and that witness cared for her in the day time and plaintiff at night and did his work on the farm in the day time; that her mind was as good as anybody's at her age; she did not have hallucinations; she would wake up in the morning and tell dreams she had.

Poesnecker testifies that six years ago he papered three rooms for deceased, and was there again two years ago; that he had a conversation with Mrs. Scott about her arrangement with plaintiff at both times he was there. She mentioned the arrangement she had made about the place and the care she was getting; said she was much pleased with the care she got; that she was to allow plaintiff $50.00 a month for taking care of her as long as she lived; that he was to be compensated when she got through with the property; that there had been some papers between them, and that the papers were drawn up and in good care; don't remember that she said where they were.

Jane Clark testifies to helping deceased in August, 1911; that she said Sam was to look after her and get the place when she was through with it. The last time witness was there in July, 1912, she says the mind of deceased was all right only she got kind of nervous over a child of one of the neighbors; heard her speak of strange noises or sounds once in a while; that she had frequent conversations with deceased while there, and that deceased knew what was going on all the time; that at times when she was wakening up from her sleep she would be a little flighty, at other times her condition appeared to be all right.

Bessie Young had known deceased since witness was a child; was at the house quite often as a neighbor during the last four years, and before that; the family consisted of plaintiff and his mother; plaintiff was caring for her; there was no one else there to do it. Witness heard her say once, "When I am gone this is Sammie's." This was three years before her death.

Defendant Brenton, testifying for plaintiff, says that he had known deceased and plaintiff ever since plaintiff has been living on the place; he owns adjoining land; that plaintiff has been carrying on the farm work ever since he has been living there with his mother, and there is no one else having anything to do with it; that he has tiled out the land and expended from seven to ten hundred dollars for tiling and two or three hundred dollars for improvements on the buildings.

There is more evidence of this character by witnesses other than plaintiff, but we do not deem it necessary to set it out.

Witness Boyd, the father of H. E. Boyd, says that at one time he saw an envelope bearing an indorsement with the name of S. W. Scott and his mother in H. E. Boyd's possession; that he was waiting in the office, and plaintiff was there getting some insurance; that H. E. Boyd picked up the envelope and says, "Sammie, do you know that?" and Sammie says, "You bet I do."

Ross Boyd, a brother of H. E., testifies that he was present and saw an envelope with indorsements in the possession of H. E.; saw it several times; handled it some of those times; the names indorsed on the envelope were Margaret N. Scott and S. W. Scott; that it was on that part of the envelope you seal; her name was written right where you seal it and S. W. Scott's was written right underneath; the names were in different handwritings; the envelope was sealed up. He last saw it three years ago. The paper was kept in the iron safe. When witness saw the envelope it was always returned to the safe.

Plaintiff, recalled, says that the time the envelope was shown him by H. E. Boyd his mother was not present; that H. E. Boyd and Thomas, his father, were present; that this was the same envelope that was taken from the home place; that the handwriting of the names on the envelope that he saw in Boyd's possession was that of his mother and himself; that the envelope was sealed up and the signatures written across the part that was sealed; that it had never been opened or disturbed.

This in brief is the substance of the testimony bearing upon the point being considered. It is without any substantial dispute. Some circumstances are shown which defendants claim indirectly bear upon it; for instance, the cashier of the bank testified that plaintiff and deceased each had a checking account during the fifteen years before her death; that plaintiff's account started in January, 1902, which was before the alleged contract; that plaintiff has had a checking account up to the time of the trial, and that deceased also had a checking account from 1905 up to her death; that the account started in 1905. It appears that she received about $580.00 in 1905 for an interest she had in an estate in New York. The brothers and sisters of plaintiff, who are defendants, testify to occasionally being at home, some of them at intervals of several years, and testify as to her doing the housework and as to her mental and physical condition in later years. Testimony was given

also as to the rental value of the land before and after plaintiff tiled the land, also as to the value of the services such as it is claimed deceased did in keeping house.

Plaintiff testified, without objection, that he did not use any other money except from the earnings of the farm, and that the statement of the cashier as to plaintiff's bank deposits represent the proceeds of the sale of the crops on the farm, and that he received no money from any other source, and that he had no money except what he received from the farm.

II. Appellees contend that plaintiff was an incompetent witness under Sec. 4604 as to the amount of care required by his mother and as to the services he actually performed.

2. EVIDENCE: transactions with deceased: competent and incompetent on same issue.

These matters were established by witnesses other than plaintiff, and we have not set out his evidence on that point. The contract itself, when established, provides for the compensation to be paid.

Appellees cite *Stevens v. Witter,* 88 Iowa 636, upon the proposition that plaintiff is not a competent witness to prove

3. WITNESS: competency: personal transaction with decedent: burden of proof.

the contents of the contract. We have already shown that there was other testimony than that of plaintiff as to the contract and its terms.

Appellant concedes the proposition to be a debatable one, and cites cases which he claims hold the evidence competent. It must be conceded that the question raised is one close to the border. Appellant cites as sustaining his claim: *Campbell v. Collins,* 133 Iowa 152; 152 Iowa 608; *McElhenney v. Hendricks,* 82 Iowa 657; *Walkley v. Clarke,* 107 Iowa 451; *Furenes v. Eide,* 109 Iowa 511; *Curd v. Wisser,* 120 Iowa 743; *Yoder v. Engleburt,* 155 Iowa 515; *Graham v. McKinney,* 147 Iowa 164; *Britt v. Hall,* 116 Iowa 564; *Marietta v. Marietta,* 90 Iowa 201.

There is some conflict in the cases construing and applying this statute. There is no disposition on the part of the court to evade the provisions of the statute, but to so apply it

to the facts of each case as to exclude testimony as to personal transactions and communications.  The facts in each case differ, making it difficult sometimes to apply the statute to the facts of one case without a seeming conflict with the holding in some other case.  It would be possible, perhaps, to give the statute such a strict and narrow construction as to exclude all evidence as being a personal transaction or communication, although it would only be inferred that it was such.  But it has been held that when the testimony is otherwise competent it is not rendered incompetent because of the fact that an inference may be drawn, from the testimony, of a personal transaction or communication.  *Campbell v. Collins*, 133 Iowa 152, 155.

As to the preparation and signing of the contract, and the negotiations and the meeting of minds as to the matters agreed upon, such would necessarily be a personal transaction, and this would be so if his only knowledge of the contents of the writing was acquired at that time and in that transaction. In the instant case it does not appear that what plaintiff testified to was acquired at the time of the execution of the contract.  That it might have been so, or that it may be so inferred, is not enough.  Defendants were the objecting parties, and the burden was upon them to show that the reading of the contract by plaintiff was a personal transaction, unless it otherwise appeared from the circumstances.  This they could have done by preliminary cross-examination on that point.  It may be that the questions by plaintiff were framed in such a manner as to avoid the objection.  So far as the record shows, plaintiff's evidence as to seeing or reading the contract may have had reference to a time a day or a month after the transaction of executing the contract was all over and it had been completely executed.  It is not shown that plaintiff's mother was even present at the time he testified he saw her signature and the contents of the writing.  She may have left the house, or the contract may have been fully executed at some prior time at another place.  If the instru-

ment had been produced, plaintiff could have testified as to his knowledge of his mother's signature and its genuineness, provided his knowledge of her signature was acquired in some other way than by seeing her sign this particular instrument, or some other personal transaction or communication. In that case, the terms of the contract would be proven by the contract itself. But it was satisfactorily shown that the contract had been lost. This being so, why may plaintiff not testify as to what he observed in regard to the contract if the transaction was past? It then became a question of proof of the terms of a lost instrument and the signature thereto, as any other lost instrument, and would be a matter of observation and recollection.

In the Stevens case, *supra,* it seems to have been assumed that, because the contract was in writing, testimony as to its contents would be a personal transaction. As we have stated, it would be so as to the execution, but we think it is not necessarily so as to what witness observed after the transaction was completed. In that case the court, to sustain the proposition, cites *Robinson v. James,* 29 W. Va. 224 (11 S. E. 920). An examination of the last case discloses that the witness, who was plaintiff claiming under a contract, obtained a knowledge of the contents of the contract at the time it was entered into, by hearing it read by one of the parties to the contract to the other, both of whom were dead at the time of the trial. It was held as to this, and other evidence of the witness consisting of transactions, communications and conversations held personally with deceased, the witness was incompetent. There is a conflict in the authorities at this point. 12 *Enc. of Evidence,* 914.

But under the record in this case, we are of opinion that the evidence of plaintiff which we have referred to was competent. Furthermore, we are satisfied that, taking the evidence all together, the contract was established in its substantial parts by evidence of witnesses other than plaintiff, though perhaps not so definitely as plaintiff states it. We might have

set out the evidence more in detail. But it is shown that plaintiff came to his mother's place at about the time his brother George left, which was 1896 or 1897; George says 1897. Mrs. Scott said plaintiff had been there fifteen years. This fixes the time. There can be no question, from the evidence of witnesses other than plaintiff, but that a contract was entered into and was entered into in writing, and the writing was entrusted to the custody of H. E. Boyd; that it cannot now be found. The deceased stated to Mrs. Rennie and Mrs. Long that such was the case. Their testimony is strengthened and corroborated by that of McQuie, Poesnecker and Mrs. Clark. The terms of this contract are shown by the testimony of Mrs. Rennie and Mrs. Long, and their testimony is in no way disputed or shaken by any other testimony. Deceased told Mrs. Rennie that the farm would belong to Sam at her death. When inquiry was made as to how this was, she stated that she had entered into a written contract with Sam, by the terms of which he was to have $50.00 a month for caring for her; that this was to be paid out of the farm or its proceeds upon her death, and that a writing to that effect had been executed and delivered to Boyd for safe keeping. Mrs. Long testified to substantially the same effect. The other witnesses referred to corroborate this testimony.

The evidence and circumstances in the record show that plaintiff was to carry on the farm. Equity will enforce the intention of the parties. The intention of the parties evidently was that plaintiff should carry on the farm and improve it; that his compensation should be $50.00 a month. The decedent stated to one of these witnesses that there was already due plaintiff about $9,000.00 under the contract. She does not give the figures $9,000.00, but did say that his compensation was to be $50.00 a month and that it had been running fifteen years, which would make $9,000.00. This was some little time before her death, and the recovery allowed by the trial court was $75.00 more than the $9,000.00. The contract was not that this land should become the property of plaintiff abso-

lutely for such services to the time of her death; that might occur in a month or· a year after the contract, in which event the plaintiff would only be entitled to his compensation ·in accordance with the terms of the contract.

III. It is contended by appellees that no lien can be created upon the homestead by an oral agreement; that a lien upon the homestead can only be created in accordance with the terms of the statutes; that the children of Mrs. Scott took her homestead free from her debts or their own debts.

4. HOMESTEAD: descent: incumbrance by widow : right of heirs.

As to the first proposition, we have already held that there was a written contract. As to the last, it is true that at Mrs. Scott's death the children would take free from ordinary debts. But the fee to her homestead was in her, and she was a single woman. She had the right and power to convey or incumber it. As shown, she did execute a contract which, as between the parties, created a lien thereon. The evidence shóws that there was a written contract by which the debt to her son was created; that Mrs. Scott had power to convey, and that by the written contract she expressly stipulated that her sixty acres, which included the homestead, should be liable for the debt.

It is said the trial court based his ruling that the homestead was not liable upon the case of *Rutt v. Howell*, 50 Iowa 535. In that case, the husband and wife were both living. Under the statute as it then existed, it was held that the verbal agreement when the money was ádvanced, that necessary papers should be executed, pledging the homestead for the debt, created no liability as to the homestead, and that a confession of judgment, reciting that, ''Execution may issue on this judgment immediately against any property belonging to said defendants, homestead included,'' was not a stipulation that the homestead should be liable, but was simply a waiver of exemption statutes. The present statute on the subject provides that no conveyance or incumbrance of, or contract to convey or incumber, the homestead, if the owner is married,

is valid, unless the husband and wife join in the execution of the same joint instrument, etc. Code Sec. 2974.

It has been held that under some circumstances even a verbal contract as to the homestead may be enforced. Thus, in *Drake v. Painter*, 77 Iowa 731, plaintiff, a married woman, after having furnished her mother's house, under an oral contract with her mother and her mother's husband, took possession of it with her family, and thereafter supported her mother and her mother's husband therein, in consideration of the property becoming hers at her mother's death, the property being the mother's homestead; it was held that when plaintiff took possession it became her homestead, the mother and her husband abandoning it in consummation of the contract, and that the performance by plaintiff of her oral contract gave to her the right and equity to the property, notwithstanding the provisions of the statute requiring the husband and wife to concur in and sign the same joint instrument in order to convey their homestead. While that case is not precisely in point as applied to the facts in the present case, still there was a contract between the parties in reference to this property, and the contract was performed by the plaintiff. The instant case is stronger in one respect than that cited in that the contract here is in writing. See also sustaining the proposition in the Drake case: *Powers v. Crandall*, 136 Iowa 659; *Franklin v. Tuckerman*, 68 Iowa 572; *Flower v. Cruikshank*, 77 Iowa 110; *Soper v. Galloway*, 129 Iowa 145.

But we deem it unnecessary to further discuss the subject. We are of opinion that the trial court should have established plaintiff's lien upon the entire sixty acres. The judgment and decree will be modified to that extent. Costs of this appeal will be taxed to defendants. Plaintiff may, at his election, have a decree in this court, or in the district court.— *Modified* and *Affirmed*.

LADD, C. J., EVANS and WEAVER, JJ., concur.